UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────────────

ZILONG WANG, an individual and citizen of the People's Republic of China; and QIUMIN CHENG, an individual and citizen of the People's Republic of China,

                Plaintiffs.

        -against-

ZHIHUI "JULIE" GUO, an individual; GOODWIN LAW GROUP, P.C., a New York State Domestic Professional Corporation; WBDC HOSPITALITY, LLC, a Delaware Limited Liability Company; ALLIANCE CAPITAL INTERNATIONAL LIMITED, a Hong Kong Limited Company; US FORTUNE LIMITED, a Hong Kong Limited Company; MARK ANDREW SINGER, an individual; and, KEVIN BRODY, an individual,

                Defendants.

**ORDER**

19 Civ. 2884 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiffs Zilong Wang and Qiumin Cheng have sued defendants Zhihui Guo, Goodwin Law Group, P.C., WBDC Hospitality, LLC, Alliance Capital International Limited, US Fortune Limited, Mark Singer, and Kevin Brody. The Amended Complaint pleads claims for (1) an equitable accounting, (2) breach of fiduciary duty, (3) fraud in the inducement, and (4) securities fraud in violation of Section 10 of the Securities and Exchange Act of 1934. (Am. Cmplt. (Dkt. No. 50) ¶¶ 84-122) Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs' security fraud allegations fail to state a claim, and that Plaintiffs' remaining claims are subject to mandatory arbitration. (Def. Br. (Dkt. No. 55))

For the reasons stated below, Defendants' motion will be granted as to all claims except for the securities fraud claim.  As to the securities fraud claim, Defendants' motion will be denied without prejudice to renewal after the remaining claims are arbitrated.

## BACKGROUND

I. **FACTS**

    A. **EB-5 Immigrant Investor Program**

The EB-5 Immigrant Investor Program was created by the Immigration Act of 1990 and is administered by the U.S. Citizenship and Immigration Service.  (Am. Cmplt. (Dkt. No. 50) ¶ 14)  The EB-5 Program provides a pathway for immigrant investors to become lawful permanent residents by investing at least $500,000 in businesses expected to employ at least 10 people.  (Id.) see also Sec. & Exch. Comm'n v. Danhong Chen, No. 18-CV-06371-LB, 2020 WL 1976494, at *1 (N.D. Cal. Apr. 24, 2020) ("The United States Citizenship and Immigration Services ('USCIS') administers the EB-5 program, which allows foreign investors to invest at least $500,000 in USCIS-approved businesses, thereafter obtain a two-year 'conditional permanent residency' visa, and (if at least ten U.S. jobs are created) obtain permanent residency.").

    B. **Plaintiffs' Investment in Wahlburgers**

In early 2016, defendant Zhihui Guo – a partner at defendant Goodwin Law Group, P.C., a New York City-based law firm – approached plaintiff Qiumin Cheng's husband about investing in a Wahlburgers fast food franchise.[1]  (Am. Cmplt. (Dkt. No. 50) ¶ 18)  Guo promoted the same investment to plaintiff Zilong Wang's parents.  (Id.)

---

[1] "Wahlburgers is a franchise chain restaurant with a menu focused on burgers.  Its name comes from the chain's founders, celebrity brothers Donnie Wahlberg, Mark Wahlberg and Paul Wahlberg."  (Am. Cmplt. (Dkt. No. 50) ¶ 16 n.1)

2

In her communications with Plaintiffs and their family members, Guo recommended the Wahlburgers investment as "an excellent and hard-to-find project." (Id. ¶ 19) She said that it had "the strongest investor protection mechanism" and a "guaranteed high probability of success." (Id.) Guo further advised that, for an EB-5 investment, the Wahlburgers franchise had an unusually high expected rate of return. (Id.)

Guo chose 1 Dupont Circle, LLC ("1 Dupont Circle") as the vehicle for Plaintiffs and their families to invest in Wahlburgers.[2] (Am. Cmplt. (Dkt. No. 50) ¶ 26) On June 16, 2016, 1 Dupont Circle and/or its Managing Member – defendant WBDC Hospitality, LLC – entered into a 15-year commercial lease for the ground floor space at One Dupont Circle, N.W., Washington, D.C. (Id. ¶ 62) The lease's term began in January 2017 at a monthly rent of $18,000. (Id.) Guo informed Plaintiffs that 1 Dupont Circle would rent and renovate the space for the Wahlburgers restaurant. (Id. ¶ 30)

In June 2016, Plaintiff Cheng's husband invested $500,000 in 1 Dupont Circle in Cheng's name. (Id. ¶¶ 20, 29) In September 2016, Plaintiff Wang and his parents invested $500,000 in 1 Dupont Circle in Wang's name. (Id. ¶¶ 21, 29) Following Guo's instructions, Plaintiffs each transferred $550,000 – representing a $500,000 investment and $50,000 in expenses – to Goodwin Law. (Id. ¶ 29) Goodwin Law acted as a "Transfer Agent" and was responsible for transmitting the funds to 1 Dupont Circle under the terms of a Transfer Agreement executed by Plaintiffs. (Transfer Agreement (Dkt. No. 54-3) ¶ 2)

---

[2] The Complaint names 1 Dupont Circle as a defendant, but Plaintiffs voluntarily dismissed their claims against that entity. (Dkt. Nos. 36, 43)

In order to effectuate their investments, Plaintiffs also executed an Operating Agreement (Dkt. No. 54-1) and a Subscription Agreement (Dkt. No. 54-2). (Am. Cmplt. (Dkt. No. 50) ¶ 31) All three Agreements include the following arbitration clause:

> Any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof, except allegations of violations of federal or state securities laws, shall be submitted to and settled by arbitration in the State of New York, pursuant to the rules then in effect of the American Arbitration Association (or at any other place or under any other form of arbitration mutually acceptable to the parties so involved), with venue in New York, New York.

(Operating Agreement § 20.3 (Dkt. No. 54-1) at 42; Subscription Agreement § 15 (Dkt. No. 54-2) at 15; Transfer Agreement § 5 (Dkt. No. 54-3) at 4-5)[3] Because they trusted Guo, Plaintiffs and their family members did not scrutinize the Agreements before signing them. (Am. Cmplt. (Dkt. No. 50) ¶ 28)

1 Dupont Circle's operations are governed by the Operating Agreement. (Operating Agreement (Dkt. No. 54-1)) Under the terms of that Agreement, WBDC is 1 Dupont Circle's Managing Member, and Plaintiffs are the Investing Members. (Id. at 4; Am. Cmplt. (Dkt. No. 50) ¶ 41) As Investing Members, Plaintiffs are required to make a 54.43% capital contribution for a 100% preferred equity membership interest in 1 Dupont Circle. (Am. Cmplt. (Dkt. No. 50) ¶ 41; Operating Agreement (Dkt. No. 54-1) at 47) Their respective $500,000 investments satisfied this obligation. (Am. Cmplt. (Dkt. No. 50) ¶ 42) As the Managing

---

[3] Citations to page numbers refer to the pagination generated by this District's Electronic Case Files ("ECF") system. The copies of the Agreements that Defendants have submitted in support of their motion to dismiss are signed by Plaintiff Cheng. Defendants represent – and Plaintiffs do not dispute – that Plaintiff Wang executed identical Agreements. (See Def. Br. (Dkt. No. 55) at 10) Defendant Kevin Brody signed all three Agreements for defendant WBCD. (Operating Agreement (Dkt. No. 54-1) at 45; Subscription Agreement (Dkt. No. 54-2) at 19; Transfer Agreement (Dkt. No. 54-3) at 8) Defendant Guo signed the Transfer Agreement for her law firm, defendant Goodwin Law. (Transfer Agreement (Dkt. No. 54-3) at 6)

4

Member, WBDC was required to make a 45.57% capital contribution for a 100% common equity membership interest in the company.  (Id. ¶ 41; Operating Agreement (Dkt. No. 54-1) at 47)

Defendants Mark Singer and Kevin Brody are the principals, owners, and "alter egos" of WBDC.  (Am. Cmplt. (Dkt. No. 50) ¶¶ 36-38, 74, 102)  The U.S. Securities and Exchange Commission ("SEC") had previously banned Singer from engaging in "many investment-related activities due to a conviction for . . . investment-related theft of over $22 million in Marion County, Indiana."  (Id. ¶ 37)  Similarly, the SEC had barred Brody from engaging in "many investment-related activities due to his . . . conviction . . . [for] . . . securities fraud and grand larceny in New York County."  (Id. ¶ 38)  Despite their criminal histories, Guo represented to Plaintiffs that Brody and Singer were "experienced and responsible professionals."  (Id. ¶ 40)

Article 8.1 of the Operating Agreement provides that "[m]ajor [d]ecisions" by 1 Dupont Circle will be made by the majority vote of a three-member Board of Managers – one member of which would be appointed by the Investing Members (i.e., Plaintiffs).  (Id. ¶ 43; Operating Agreement (Dkt. No. 54-1) at 14)  Article 8.2 of the Operating Agreement provides that "so long as any Investing Member remains as a Member in [1 Dupont Circle], the Managing Member shall not enter into any transaction which materially change[s] the management of [1 Dupont Circle]."  (Am. Cmplt. (Dkt. No. 50) ¶ 44; Operating Agreement (Dkt. No. 54-1) at 15)  Finally, Article 13.1 of the Operating Agreement states "that so long as any Investing Member remains as a Member in [1 Dupont Circle], the Managing Member shall have no right to sell or assign all or any part of the Managing Member's Common Membership Interests to any Person without the prior written consent of the Investing Member Representative."  (Am. Cmplt. (Dkt. No. 50) ¶ 46; Operating Agreement (Dkt. No. 54-1) at 31)

On September 18, 2017, Defendants executed an Amended Operating Agreement. (Am. Cmplt. (Dkt. No. 50) ¶ 47) Defendants allegedly forged Plaintiffs' signatures on the Amended Operating Agreement by "us[ing] . . . computer software to illicitly 'cut and paste' their signatures" without authorization. (Id. ¶ 49) In amending the Operating Agreement, Defendants sought to strip Plaintiffs of their right to participate in 1 Dupont Circle's "major decision-making process." (Id. ¶ 52)

Pursuant to the Amended Operating Agreement, Guo became 1 Dupont Circle's sole manager and obtained "exclusive authority to enter any agreements with other parties and make any decisions on behalf of" 1 Dupont Circle. (Id. ¶ 53) In violation of Article 13.1 of the original Operating Agreement, sometime before November 22, 2017, WBDC transferred 18% of its ownership interests in 1 Dupont Circle to defendant Alliance Capital International Limited – a Hong King-based "Limited Company" – without Plaintiffs' knowledge or permission. (Id. ¶¶ 7, 56-57) On November 22, 2017, WBDC and Alliance Capital transferred their entire ownership interest in 1 Dupont Circle to US Fortune Limited – another Hong Kong-based "Limited Company" – without Plaintiffs' knowledge or permission. (Id. ¶¶ 8, 59) Guo is the owner, director, and "alter ego" of both Alliance Capital and US Fortune. (Id. ¶¶ 58, 60, 75, 103) Plaintiffs allege that these transfers – which Plaintiffs never approved – materially change the management of 1 Dupont Circle, in violation of the Operating Agreement.[4] (Id. ¶¶ 57-58)

In March 2017, WBDC and/or 1 Dupont Circle stopped paying rent for the space at One Dupont Circle. (Am Cmplt. (Dkt. No. 50) ¶ 63) In January 2018 – after months of missed rent payments and after the landlord learned that US Fortune had assumed ownership of 1

---

[4] When Plaintiffs and their family members later learned that 1 Dupont Circle's Managing Member had changed and asked for an explanation, Guo asserted that the changes in management were confidential and that she, as an attorney, could not discuss them. (Id. ¶ 70)

Dupont Circle, which the landlord deemed "a change in the tenant in violation of the lease" – the lease was terminated. (Id. ¶¶ 63-64) In April 2018, the landlord commenced eviction proceedings, which resulted in 1 Dupont Circle, WBDC, Guo, Alliance Capital, and US Fortune being evicted from the premises. (Id. ¶ 65) As a result of the breach of the lease and the eviction proceedings, 1 Dupont Circle incurred significant legal fees and expenses. (Id. ¶ 66) Guo had never informed Plaintiffs that WBDC and 1 Dupont Circle were not paying rent. (Id. ¶ 63) After "persistent inquiries [from Plaintiffs] and their families," Guo told Plaintiffs that "the landlord simply had a change of heart." (Id. ¶ 69)

Plaintiffs' investment did not create the ten jobs required for Plaintiffs to obtain U.S. permanent resident status. (Id. ¶ 111) And despite repeated inquiries, Defendants have refused to provide Plaintiffs with an accounting concerning their investment. (Id. ¶ 83)

Plaintiffs allege that Brody, Singer, and Guo failed to adequately capitalize WBCD, Alliance Capital, and US Fortune, and that these entities – as Managing Members of 1 Dupont Circle – never made their required capital contributions, which amounted to $837,222.12. (Id. ¶¶ 74-75) Plaintiffs further allege that each Defendant used a portion of Plaintiffs' combined $1,000,000 capital contribution "for their own purposes and for other business projects, and/or retained a portion . . . for themselves." (Id. ¶ 107)

### B.     Procedural History

The Complaint was filed on April 1, 2019. (Cmplt. (Dkt. No. 1)) An Amended Complaint was filed on August 9, 2019, which asserts the following claims: (1) equitable accounting, (2) breach of fiduciary duty, (3) fraud in the inducement, and (4) securities fraud in violation of Section 10 of the Securities and Exchange Act of 1934. (Am. Cmplt. (Dkt. No. 50) ¶¶ 84-122))

7

On September 20, 2019, Defendants moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs' accounting, breach of fiduciary duty, and fraud claims are subject to mandatory arbitration under 9 U.S.C. § 4, and that Plaintiffs' securities fraud allegations fail to state a claim.  (Def. Br. (Dkt. No. 55))

In opposing the motion, Plaintiffs argue, inter alia, that most of the Defendants lack standing to enforce the relevant arbitration clauses because they were not signatories to the Agreements that contain these clauses.  (Pltf. Opp. (Dkt. No. 58) at 10)  As to the securities fraud claim, Plaintiffs argue that the Amended Complaint is replete with "highly particularized allegations" of securities fraud.  (Id. at 16)

## DISCUSSION

### I. LEGAL STANDARDS

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement."  9 U.S.C. § 4.  The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution."  Hartford Accident & Indem. Co. v. Swiss Reinsur. Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion."  Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)).  "As on a motion for summary judgment, the parties may submit documents in support or opposition of their motion, and the court 'consider[s] all relevant, admissible evidence

submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party.'" Cornelius v. Wells Fargo Bank, N.A., No. 19-CV-11043 (LJL), 2020 WL 1809324, at *4 (S.D.N.Y. Apr. 8, 2020) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002)). "If the party seeking arbitration demonstrates its entitlement to arbitration by a showing of evidentiary facts, the burden then shifts to the opposing party to submit evidentiary facts demonstrating there is a dispute of fact showing that the agreement is inapplicable or invalid." Id. A party resisting arbitration "may not satisfy this burden through 'general denials of the facts on which the right to arbitration depends'; in other words, '[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried.'" Dill v. JPMorgan Chase Bank, N.A., No. 19 CIV. 10947 (KPF), 2020 WL 4345755, at *4 (S.D.N.Y. July 29, 2020) (quoting Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995)).

"If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). Where, however, "the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, 661 F.3d 164, 172 (2d Cir. 2011)). Courts, not arbitrators, must decide whether parties have agreed to arbitrate "unless the parties clearly and unmistakably provide otherwise." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016).

9

In deciding whether claims are subject to arbitration, courts consider: "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." Begonja v. Vornado Realty Trust, 159 F. Supp. 3d 402, 408-09 (S.D.N.Y. 2016) (citing Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008)).

## II.   ANALYSIS

### A.   First Element:  Whether the Parties Agreed to Arbitrate

In the Amended Complaint, Plaintiffs acknowledge having "signed various investment and immigration documents, including an 'Operating Agreement of 1 Dupont Circle, LLC' (the 'Operating Agreement')." (Am. Cmplt. (Dkt. No. 50) ¶ 31)  As discussed above, the Operating Agreement contains an arbitration clause.  (Operating Agreement (Dkt. No. 54-1) at 42)  Defendants have submitted evidence that Plaintiffs also signed the Subscription Agreement and the Transfer Agreement, which include an identical arbitration clause.  (Subscription Agreement (Dkt. No. 54-2) at 15; Transfer Agreement (Dkt. No. 54-3) at 4-5)  Although Plaintiffs claim that Defendants forged their signatures on the Amended Operating Agreement (Am. Cmplt. (Dkt. No. 50) ¶¶ 47-49), they do not deny signing the other Agreements.  (Pltf. Opp. (Dkt. No. 58) at 8-13)  The Court therefore concludes that Plaintiffs agreed to arbitrate disputes arising under the Operating Agreement, Subscription Agreement, and Transfer Agreement.

Plaintiffs contend that defendants Guo, Alliance Capital, US Fortune Limited, Brody, and Singer lack standing to enforce the arbitration clauses, because they are not parties to

the Operating, Subscription, and Transfer Agreements.[5] (Pltf. Opp. (Dkt. No. 58) at 10) A non-signatory may enforce an arbitration agreement on an equitable estoppel theory, however, when "'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" Denney v. BDO Seidman, L.L.P., 412 F.3d 58, 70 (2d Cir. 2005) (quoting JLM Indus. v. Stolt-Nielsen S.A., 387 F.3d 163, 177 (2d Cir. 2004)).

"Courts in this district have applied a two-part test in 'determining whether the signatory's claims are intertwined with the underlying contract obligations, analyzing whether (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party." Lismore v. Societe Generale Energy Corp., No. 11 Civ. 6705 (AJN), 2012 WL 3577833, at *6-7 (S.D.N.Y. Aug. 17, 2012) (quoting Ragone v. Atl. Video at Manhattan Ctr., No. 07 CIV. 6084 (JGK), 2008 WL 4058480, at *8 (S.D.N.Y. Aug. 29, 2008), aff'd, 595 F.3d 115 (2d Cir. 2010) (alterations omitted))

Plaintiffs' claims arise under the Operating, Transfer, and Subscription Agreements, which govern Plaintiffs' investment in 1 Dupont Circle. That investment is central to all of Plaintiffs' claims. Indeed, Plaintiffs do not dispute that their claims arise under the subject matter of these Agreements. (Pltf. Opp. (Dkt. No. 58) at 8-13) Accordingly, the first requirement is satisfied.

Moreover, although Guo, Alliance Capital, US Fortune Limited, Brody, and Singer are not parties to the Agreements, they are closely related to signatories. As to Guo, she

---

[5] Defendant WBCD is a signatory to the Operating Agreement and the Subscription Agreement (Dkt. No. 54-1 at 45; Dkt. No. 54-2 at 19), and defendant Goodwin Law is a signatory to the Transfer Agreement. (Dkt. No. 54-3 at 6) Plaintiffs do not dispute that WBCD and Goodwin Law have standing to enforce the arbitration clause. (Pltf. Opp. (Dkt. No. 10) at 10)

11

signed the Transfer Agreement on behalf of Goodwin Law, the law firm in which she is a partner. (Transfer Agreement (Dkt. No. 54-3) at 6) Accordingly, Guo is plainly closely related to a signatory party. See McLaughlin v. MacQuarie Capital (USA) Inc., No. 17-CV-9023 (RA), 2018 WL 3773992, at *4 n.5 (S.D.N.Y. Aug. 7, 2018) ("'[C]ourts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement.'") (quoting Campaniello Imps., Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 668 (2d Cir. 1997)); McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co., No. 14-CV-6633 (KBF), 2015 WL 144190, at *7 (S.D.N.Y. Jan. 12, 2015) ("[T]he corporate agent may use the arbitration provision as a sword to compel arbitration, which is to say, a shield against litigation before a court.").

As to Alliance Capital and US Fortune, according to the Amended Complaint, Guo is the "principal," "owner," and "alter ego" of these entities. (Am. Cmplt. (Dkt. No. 50) ¶ 103) Plaintiffs' claims against these entities are therefore also subject to arbitration. See Meridian Autonomous Inc. v. Coast Autonomous LLC, No. 17-CV-5846 (VSB), 2018 WL 4759754, at *4 (S.D.N.Y. Sept. 30, 2018) ("Courts have found that where a plaintiff treats the defendants, some of which are signatories and some of which are non-signatories, 'as a single unit in its complaint[, the plaintiff] is estopped from claiming that the current signatories [to the arbitration clause] are distinct from the [non-signatory] defendants.'") (quoting Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir. 1999)); TIC Park Ctr. 9, LLC v. Wojnar, No. 16-CV-4302 (ARR) (JO), 2016 WL 6068136, at *6 (E.D.N.Y. Oct. 14, 2016) ("The Second Circuit has applied estoppel in cases where 'the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party

. . . [i.e.,] subsidiaries, affiliates, agents, and other related business entities.'") (quoting Ross v. Am. Express Co., 547 F.3d 137, 144 (2d Cir. 2008)) (emphasis omitted).

As to Brody, he signed the Operating Agreement and Subscription Agreement for WBDC.  (Operating Agreement (Dkt. No. 54-1) at 45; Subscription Agreement (Dkt. No. 54-2) at 19; Am. Cmplt. (Dkt. No. 50) ¶ 41)  And according to the Amended Complaint, Brody and Singer are "principals," "owners," and "alter egos" of WBCD.  (Am. Cmplt. (Dkt. No. 50) ¶ 102)  Given their alleged relationship to WBCD, Plaintiffs' claims against Brody and Singer are covered by the arbitration clauses.  See Yorke v. TSE Grp. LLC, No. 18-CV-5268 (JMF), 2019 WL 3219384, at *3 (S.D.N.Y. July 17, 2019) (claims against a non-signatory to arbitration clause were arbitrable given non-signatory's status as an "alleged owner, principal, and/or manager" of a signatory); Zambrana v. Pressler & Pressler, LLP, No. 16-CV-2907 (VEC), 2016 WL 7046820, at *6 (S.D.N.Y. Dec. 2, 2016) ("'A non-signatory to an arbitration agreement may benefit from that agreement where . . . the non-signatory is the disclosed agent or principal of the signatory.'") (quoting Hoffman v. Aaron Kamhi, Inc., 927 F. Supp. 640, 643 (S.D.N.Y. 1996)).

Because both prongs of the equitable estoppel test are satisfied, Plaintiffs' claims – including those against non-parties to the relevant agreements – are subject to arbitration.

Finally, Plaintiffs argue that the arbitration clauses should not be enforced because they were "'part of [Defendants'] fraudulent scheme.'"  (Pltf. Opp. (Dkt. No. 58) at 12 (quoting Garten v. Kurth, 265 F.3d 136, 142 (2d Cir. 2001))  "[T]o escape the effect of an arbitration clause based on fraudulent inducement," however, "the party seeking to avoid arbitration must 'show that the arbitration clause itself is unenforceable.'"  Lefkowitz v. Reissman, No. 12 CIV. 8703 RA, 2014 WL 925410, at *9 (S.D.N.Y. Mar. 7, 2014) (quoting Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005)).  "The party challenging the clause may not

13

'establish a connection between the alleged fraud and the arbitration clause in particular merely by adding the allegation that the arbitration clause was a part of the overall scheme to defraud'; rather, the complaint must include 'particularized facts specific to the arbitration clause which indicate how it was used to effect the scheme to defraud.'" Id. (quoting Rubin v. Sona Int'l Corp., 457 F. Supp. 2d 191, 195 (S.D.N.Y. 2006)).

Here, Plaintiffs allege no facts – much less particularized facts – demonstrating that the arbitration clauses were instrumental to the alleged fraud. Accordingly, Plaintiffs' argument is not persuasive.

The Court concludes that the first element for enforcement of the arbitration clauses is satisfied.

### B. Second Element: Arbitration Agreement's Scope

Each arbitration clause states that it applies to "[a]ny dispute, controversy or claim arising out of or in connection with, or relating to [the Operating, Transfer, or Subscription Agreement] or any breach or alleged breach hereof, except allegations of violations of federal or state securities laws." (Operating Agreement § 20.3 (Dkt. No. 54-1) at 42; Subscription Agreement § 15 (Dkt. No. 54-2) at 15; Transfer Agreement § 5 (Dkt. No. 54-3) at 4-5) Defendants argue that the arbitration clauses encompass all of Plaintiff's claims except their securities fraud claim. Plaintiffs do not argue otherwise. (Def. Br. (Dkt. No. 55) at 14; Pltf. Opp. (Dkt. No. 58) at 8-13)

This Court concludes that Plaintiffs' claims "aris[e] out of" or "relat[e] to" the Agreements. (Operating Agreement § 20.3 (Dkt. No. 54-1) at 42; Subscription Agreement § 15 (Dkt. No. 54-2) at 15; Transfer Agreement § 5 (Dkt. No. 54-3) at 5) These Agreements facilitated Plaintiffs' investment in 1 Dupont Circle, which is central to all of Plaintiffs' claims.

See KLP Enterprises, LLC v. Sassani, No. 3:17-CV-665 (MPS), 2019 WL 2548135, at *9 (D. Conn. June 20, 2019) ("'[P]hrases such as 'in connection with' or 'related to' are considered broad enough to encompass all claims that are directly related to the contract . . . and collateral issues that . . . relate to the parties' main agreement.'") (quoting Sherrod v. Time Warner Cable, Inc., No. 14-CV-1471 JLC, 2014 WL 6603879, at *5 (S.D.N.Y. Nov. 21, 2014))  Because the arbitration clause in each Agreement explicitly excludes claims premised on "federal . . . securities laws," however, the clause does not reach Plaintiffs' securities fraud claim.  See State of N.Y. v. Oneida Indian Nation of New York, 90 F.3d 58, 62 (2d Cir. 1996) (claim not subject to arbitration where "the arbitration clause, read as a whole, evinces the parties' intent to exclude the type of claim at issue here from mandatory arbitration").

### C. Third Element:  Congressional Intent

As to the third element, there is no indication that Congress intended to exempt from arbitration Plaintiffs' claims for equitable accounting, breach of fiduciary duty, and fraud. See Josie-Delerme v. Am. Gen. Fin. Corp., No. 08-CV-3166(NG), 2009 WL 2366591, at *4 (E.D.N.Y. July 31, 2009) (noting that "New York common law" claims are arbitrable); see also Envtl. Energy Servs., Inc. v. Cylenchar Ltd., No. 3:11-CV-0039 JCH, 2011 WL 4829851, at *6 (D. Conn. Oct. 12, 2011) ("[I]t is clearly established that . . . common law claims are arbitrable.").  Accordingly, the third element is satisfied.

### D. Fourth Element:  Stay

Given that one of Plaintiffs' claims is not subject to arbitration, the Court must decide whether to allow that claim to proceed or to stay it pending arbitration of Plaintiffs' remaining claims.  "'The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket.'"  Morelli v. Alters, No.

15

1:19-CV-10707-GHW, 2020 WL 2306445, at *3 (S.D.N.Y. May 8, 2020) (quoting Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987)).  In deciding whether to stay a case pending arbitration, the "'Court must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution.'"  Id. (quoting Katsoris v. WME IMG, LLC, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017)).  "Discretionary stays are appropriate where there is a substantial amount of factual overlap between arbitrable claims and claims that cannot be arbitrated."  Tessemae's LLC v. Atlantis Capital LLC, No. 18-CV-4902 (KHP), 2019 WL 3936964, at *8 (S.D.N.Y. Aug. 20, 2019) (citing cases).

A stay is appropriate here given the overlap between the facts underlying the arbitrable claims and the securities fraud claim.  Defendants' alleged fraudulent investment scheme forms the basis for all of Plaintiffs' claims.  (Am. Cmplt. (Dkt. No. 50) ¶¶ 84-122)  This factual overlap counsels strongly in favor of a stay of Plaintiffs' securities fraud claim.  See, e.g., Chang v. United Healthcare, No. 19-CV-3529 (RA), 2020 WL 1140701, at *6 (S.D.N.Y. Mar. 9, 2020) ("There is significant factual overlap between Plaintiff's [arbitrable and non-arbitrable] claims.  Accordingly, a stay . . . will avoid piecemeal litigation and lead to a more expeditious, economical resolution of the dispute."); Catlin Syndicate 2003 v. Traditional Air Conditioning, Inc., No. 17-CV-2406 (JFB) (AYS), 2018 WL 3040375, at *8 (E.D.N.Y. June 18, 2018) ("[G]iven the significant overlap among plaintiff's claims, the Court concludes, in its discretion, that a stay is appropriate."); Louis Berger Grp., Inc. v. State Bank of India, 802 F. Supp. 2d 482, 489 (S.D.N.Y. 2011) ("A stay is usually appropriate where arbitrable and non-arbitrable claims arise out of the same set of facts and arbitration may decide the same facts at issue in the litigation."); Midland Walwyn Capital Inc. v. Spear, Leeds & Kellogg, No. 92 Civ. 2236 (LLM),

16

1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992) ("The courts in this district have consistently granted stays pending arbitration where the nonarbitrable issues overlap the arbitrable issues, thus minimizing inconsistent results and conserving judicial resources.").[6]

## CONCLUSION

Defendants' motion to dismiss (Dkt. No. 53) is granted as to the Amended Complaint's first four claims (see Am. Cmplt. (Dkt. No. 50) ¶¶ 84-114), because those claims are subject to mandatory arbitration. Defendants' motion to dismiss Plaintiffs' securities fraud claim is denied without prejudice to renewal after the arbitration proceeding is concluded. That claim will be stayed during the pendency of the arbitration.[7] The parties are directed to file a joint status letter every 90 days until the arbitration is complete. The Clerk of Court is directed

---

[6] Plaintiffs argue that Defendants' motion with respect to the arbitrable claims must be denied, because Defendants moved to dismiss those claims instead of moving to compel arbitration. (Pltf. Opp. (Dkt. No. 58) at 10) This argument fails for two reasons. First, although Defendants styled their motion as a motion to dismiss, it is apparent from Defendants' papers that they are arguing that Plaintiffs' claims should be resolved in arbitration. (Def. Br. (Dkt. No. 55) at 8 ("Defendants intend to vigorously contest [Plaintiff's claims] in the appropriate arbitral forum")) Accordingly, the Court construes Defendants' motion as seeking to compel arbitration. See Boss Worldwide LLC v. Crabill, No. 19 CV 2363 (VB), 2020 WL 1243805, at *1 (S.D.N.Y. Mar. 16, 2020) ("constru[ing] the motion to dismiss as one to compel arbitration"). Second, dismissal can be appropriate where a court decides that claims are subject to mandatory arbitration. Accordingly, there is nothing improper in a defendant that is seeking to compel arbitration styling its papers as a motion to dismiss. See Id. at *4 (S.D.N.Y. Mar. 16, 2020) ("When, as here, a stay is not requested, the Court 'has discretion in determining whether to stay or dismiss the case pending arbitration.'") (quoting Worthington v. JetSmarter, Inc., 2019 WL 4933635, at *8 (S.D.N.Y. Oct. 7, 2019)).

[7] See, e.g., Delgado v. Ocwen Loan Servicing, LLC, No. 13CV4427 NGG ST, 2016 WL 4617159, at *13 (E.D.N.Y. Sept. 2, 2016) ("While the court could . . . address . . . Defendants' arguments for dismissal of . . . claims that are not affected by the arbitration challenge, the court is disinclined to take a piecemeal approach. . . ."); Winter Inv'rs, LLC v. Panzer, No. 14 CIV. 6852, 2015 WL 5052563, at *12 (S.D.N.Y. Aug. 27, 2015) ("The Court appreciates that LH believes it has strong arguments to dismiss the [claims against it]. . . . These arguments may be renewed promptly for the Court's consideration, either verbatim or in modified fashion, following the arbitration proceedings."); Graham v. BMO Harris Bank, N.A., No. 3:13CV1460 WWE, 2014 WL 4090548, at *7 (D. Conn. July 16, 2014) ("The Court will grant the motions to

to terminate the motion (Dkt. No. 53).

Dated: New York, New York
       August 22, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

compel arbitration and will deny without prejudice any pending motions to dismiss on grounds other than the arbitration provision."); Errato v. Am. Express Co., No. 3:18-CV-1634 (VAB), 2019 WL 3997010, at *16 (D. Conn. Aug. 23, 2019) ("All remaining pending motions to dismiss the Amended Complaint are DENIED at this time in light of the stay of these proceedings, without prejudice to renewal after the arbitration has concluded.").